*522 Opinión disidente emitida por el
Juez Presidente Señor Hernández Denton,
a la cual se unen la Juez Asociada Señora Rodríguez Rodríguez y los Jueces Asociados Se-ñores Martínez Torres y Estrella Martínez.
Disentimos de la Opinión que hoy emite una mayoría de este Tribunal por entender que la figura del enriqueci-miento injusto es inaplicable a este caso. Además, entende-mos que el foro judicial no debe asumir la responsabilidad de valorar bienes embargados, práctica que hasta hoy era realizada por los licitadores que acuden a las subastas. Creemos que, en el contexto de la ejecución por sentencia, el valor de los bienes subastados debe continuar siendo el que establecen los licitadores.
I
En este caso, el Tribunal de Primera Instancia dictó sentencia declarando “con lugar” una demanda de daños y perjuicios por impericia médica instada por los recurridos, el Sr. Arkel Sánchez Torres, su esposa, la Sra. Lourdes Ló-pez Torres, y la Sociedad Legal de Gananciales compuesta por ambos (matrimonio demandante). Los foros inferiores entendieron probado que la señora López Torres sufrió una serie de daños físicos considerables, por lo que declararon responsables a los codemandados peticionarios, el Dr. Luis G. Valentín Méndez, su esposa y la Sociedad Legal de Ga-nanciales compuesta por ambos (médico demandado). Como resultado del litigio, se concedió una suma que, tras ser reducida por el Tribunal de Apelaciones, totalizó una cuantía global de $325,000. La sentencia que impuso esa cuantía advino final y firme.
El matrimonio demandante obtuvo una anotación pre-ventiva en aseguramiento de sentencia sobre la residencia ganancial del médico demandado y, posteriormente, el foro *523 primario dictó una orden de ejecución de sentencia. Se ce-lebró la subasta correspondiente, se declaró vacante y se le adjudicó la propiedad al matrimonio demandante, el cual ofreció un abono de sentencia por un valor de $50,000. Transcurridos dos años de la reventa de la propiedad a unos terceros por el precio de $392,000, el matrimonio de-mandante acudió nuevamente al foro de primera instancia y solicitó que se le ordenara al médico demandado a satis-facer el balance adeudado en virtud de la sentencia por daños, a saber, $325,000 menos los $50,000 representados por el valor de la propiedad adjudicada en la subasta.
El médico demandado respondió que la adjudicación de la residencia al matrimonio demandante tuvo el efecto de satisfacer la sentencia en su totalidad. En apoyo de ese argumento, presentó una tasación de la casa realizada du-rante la pendencia del litigio entre ambos, en la cual el inmueble obtuvo un valor de $475,000. El Tribunal de Pri-mera Instancia resolvió que la cuantía que debía aplicarse a la deuda debía ser el valor del inmueble en el mercado a la fecha de la subasta, luego de deducidas las cargas hipo-tecarias que le afectaban. Es decir, su valor neto o equity. La propiedad tenía dos gravámenes hipotecarios que el ad-quirente debió cubrir, por lo que el foro de primera instan-cia concedió un plazo para que las partes acordaran el valor neto de la propiedad al momento de la celebración de la subasta.
Insatisfecho, el matrimonio demandante acudió ante el Tribunal de Apelaciones. El foro apelativo intermedio re-vocó al foro primario y resolvió que el valor del inmueble para efectos de la deuda por sentencia es el valor por el cual se adquirió el inmueble en la subasta. Dicho de otra forma, resolvió que, para propósitos de satisfacer una sen-tencia, el único valor que se le puede adjudicar a un bien subastado en ejecución es el valor que se ofrece en la su-basta; en este caso, $50,000. Inconforme, el médico deman-dado acudió ante nos.
*524 En síntesis, el argumento de los peticionarios es que el Art. 220 de la Ley Hipotecaria y del Registro de la Propiedad (Ley Hipotecaria), 30 L.P.R.A. sec. 2720, exige que las ventas de bienes inmuebles en procedimientos de subasta estén sujetos a un precio mínimo. Como en este caso no se celebró la subasta a partir de ese precio mínimo —conocido en el derecho hipotecario como "tipo mínimo”— aducen que el valor real que recibieron los demandantes a quienes se les adjudicó la residencia es mucho mayor al abono conce-dido a la sentencia y que ello conlleva que se dé por extinguida.
Así las cosas, le concedimos un término al matrimonio demandante para que se expresara.
II
Atendido el recurso, nos correspondía determinar si la adjudicación de un inmueble a favor de un acreedor por sentencia, tras declararse vacante una subasta, conlleva que solo se aplique el valor de remate a la acreencia, o si, por el contrario, se debe imputar el valor en el mercado del bien objeto de subasta al momento de celebrarse esta u otro valor mínimo análogo bajo la Ley Hipotecaria, 30 L.P.R.A. sec. 2001 et seq.
Como bien señala la Opinión mayoritaria, en el ámbito hipotecario las propiedades ejecutadas se subastan a par-tir de un tipo o precio mínimo pactado por los contratantes al otorgarse la hipoteca. Art. 179 de la Ley Hipotecaria, 30 L.P.R.A. sec. 2575. Véase, además, Rodríguez Morales v. Registrador, 142 D.P.R. 347 (1997). De esa manera, en be-neficio tanto del acreedor como del deudor, se evita que las propiedades sean subastadas por un precio excesivamente bajo que no refleje su valor en el mercado. Coop. Ahorro y Créd. v. Registrador, 142 D.P.R. 369 (1997). Ese tipo mí-nimo también se imputa cuando, tras declararse vacante la tercera subasta, la propiedad inmueble se le adjudica al *525 acreedor. Id.; 30 L.P.R.A. sec. 2575. No obstante, en el ám-bito de las subastas en ejecución de sentencia que no tie-nen que ver con deudas hipotecarias, esa protección del tipo mínimo no existe. Ello conlleva que, en algunas oca-siones, las propiedades, tanto inmuebles como muebles, sean adjudicadas a precios excesivamente bajos, también conocidos como “valor de remate”.
Por ello, una mayoría resuelve correctamente que no puede admitirse un tipo mínimo como parte del proceso de subastas que no tienen que ver con una ejecución hipote-caria porque “no existe base en derecho para imple-mentar[lo]”. (Enfasis suplido). Opinión mayoritaria, pág. 509. En ese sentido, lo correcto era confirmar la determi-nación del Tribunal de Apelaciones.
La celebración de subastas para la ejecución de senten-cias que no tienen que ver con el derecho hipotecario se atiende conforme a las Reglas de Procedimiento Civil. En esencia, la Regla 51.8 de Procedimiento Civil de 1979,(1) 32 L.P.R.A. Ap. III, establece que la propiedad simplemente se le adjudicará “al mejor postor”. Por ello, como bien esta-blece la ponencia mayoritaria, no se requiere la fijación de un precio mínimo para la venta de esos bienes. Nuestro ordenamiento tampoco reconoce un mecanismo para calcu-lar el valor de los bienes a subastarse. A esos efectos, se ha resuelto que “para que una venta en ejecución de sentencia sea nula, el precio pagado en ella debe ser tan exagerada-mente inadecuado que cree una presunción de fraude”. Ramery Vélez v. Banco Popular, 90 D.P.R. 274, 280 (1964).
Además, hemos reconocido que el valor de una propie-dad necesariamente se afecta cuando se tiene que disponer de ella a través del mecanismo forzado de la subasta pública. Figueroa v. Banco de San Juan, 108 D.P.R. 680 (1979). Incluso, la Opinión mayoritaria añade que los re- *526 quisitos procesales de la regla sobre subasta imponen la obligación de entregar, en el acto mismo de la adjudicación, la moneda legal o cheque de gerente por el valor de la pro-piedad adjudicada. Ello, a su vez, conlleva que un universo reducido de participantes del mercado puedan beneficiarse de participar en la subasta, lo que abona a la disminución del precio.
Más aún, la Opinión mayoritaria sostiene que, en este caso, el mero hecho de que una casa que años antes tasaba $475,000 se haya adjudicado en subasta por $50,000, no conlleva que esa suma sea “exageradamente inadecuada”, pues al adquirirla, los acreedores asumieron dos graváme-nes hipotecarios que sumaban $245,000.
A pesar de que toda la normativa discutida hasta este punto de la Opinión del Tribunal da lugar únicamente a concluir que no se puede imponer —por analogía— un tipo mínimo para la venta de bienes en subasta cuando no media una hipoteca, la opinión mayoritaria aplica la doctrina de enriquecimiento injusto. Entendemos que la mayoría del Tribunal yerra en su proceder.
III
La doctrina de enriquecimiento injusto recoge una fuente de obligaciones que nacen fuera de una relación contractual y que hemos desarrollado jurisprudencial-mente. Ortiz Andújar v. E.L.A., 122 D.P.R. 817 (1988). Nos dice la profesora Fontánez Torres que “el enriquecimiento injusto es un corolario del concepto de equidad; que está subsumido en el Código Civil en la figura de los cuasicon-tratos; y que es de carácter subsidiario, en otras palabras, que no puede existir una causa que justifique el enriquecimiento”. E. Fontánez Torres, Obligaciones y contratos, 75 (Núm. 1) Rev. Jur. U.P.R. 245, 258 (2006). Véanse los Arts. 1787 a 1801 (31 L.P.R.A. secs. 5091-5127). En síntesis, el enriquecimiento injusto ocurre cuando una *527 parte se enriquece a costa de otra sin que exista alguna causa o fuente que justifique un desplazamiento patrimonial. Ortiz Andújar v. E.L.A., supra.
Los criterios para aplicar la doctrina de enriquecimiento injusto son: (1) existencia de un enriquecimiento; (2) un empobrecimiento correlativo de quien reclama la aplica-ción de la doctrina; (3) una conexión o relación causal entre el empobrecimiento y el enriquecimiento; (4) falta de una causa o precepto legal que justifique el enriquecimiento, y (5) inexistencia de un precepto legal que excluya la aplica-ción del enriquecimiento sin causa. Véase J.R. Vélez Torres, Derecho de obligaciones, 2da ed., San Juan, Ed. U.I.P.R., 1997, pág. 347.
IV
La Opinión que hoy se emite afecta la seguridad jurídica y el tráfico de bienes. Además, puede dar lugar a conse-cuencias impredecibles e imprácticas. El derecho aplicable —el mismo que la Opinión del Tribunal analiza— es claro y específico: solo en el ámbito hipotecario existe el requisito de tipo mínimo. Asimismo, las reglas para la ejecución de una sentencia están diseñadas con el propósito de proteger al acreedor. Si un deudor interesa evitar la ejecución de sus bienes, tiene que entregar lo adeudado y cumplir con la orden judicial dictada en su contra. Para ello, el deudor puede vender sus bienes al precio que estime y, de esa forma, evita el riesgo del precio de remate. Esto último re-quiere particular énfasis, porque en el caso de autos el deu-dor se colocó a sí mismo en una posición perjudicial y luego acudió al foro judicial para que se le releve de sus obligaciones.
De otra parte, aplicar la doctrina de enriquecimiento injusto conlleva pasar por alto que aquí existe una causa legal para el enriquecimiento. La razón de ese enriqueci-miento es que el deudor por sentencia, teniendo bienes *528 para cumplir con la orden judicial, optó por no cederlos o venderlos e incumplió con ella. Por ello, se colocó motu pro-prio en la desventajosa situación de que sus bienes se su-bastaran al precio que resulta —necesariamente— de po-ner en vigor la Regla de Procedimiento Civil aplicable.
El ordenamiento que compele a la celebración de la su-basta, con los parámetros que se han diseñado para ello y con los riesgos que ello conlleva, es la causa de ese benefi-cio económico correlativo. En particular, el Acta de Subasta recoge, para fines contractuales, los términos y las condi-ciones de ese desplazamiento patrimonial avalado por la normativa vigente. Dicho de otra forma, en este caso se dictó una sentencia para conceder una cuantía por daños, esa cuantía fue modificada y se convirtió en final y firme. Posteriormente, se embargó un bien del deudor por senten-cia y se sometió a subasta. Esa es la causa de la transfe-rencia patrimonial entre el deudor por sentencia y el acree-dor en este caso. Esa es, además, la consecuencia de poner en vigor las reglas y disposiciones que el ordenamiento provee para una subasta.
Además, no podemos perder de vista que la norma que pauta este Tribunal es el resultado directo de que los acreedores lograran revender la propiedad a un precio mayor. Ese no siempre es el caso. Si este Tribunal asu-miera que la propiedad se vendió a un precio que repre-sente una pérdida para el acreedor, no llegaría a este re-sultado, pues los deudores no habrían acudido a plantear ante el Tribunal de Primera Instancia que la sentencia ha-bía sido satisfecha en su totalidad. Desde el punto de vista del deudor, la apreciación futura de un bien subastado es totalmente impertinente.
En este caso, el hecho cierto es que cuando se llamó la subasta, el mercado al cual el ordenamiento había estable-cido que se iban a ofrecer los bienes objeto de subasta, es decir, quienes estaban ese día presentes en el Tribunal de *529 Primera Instancia, decidió que el valor de ese bien era $50,000, no el valor neto.
Por otro lado, la Asamblea Legislativa conoce, como mí-nimo desde la aprobación de la Ley Hipotecaria en 1979, sobre la existencia del concepto de tipo mínimo y nunca lo ha aplicado a circunstancias como la de autos. Al hacerlo por fíat judicial, no solo ignoramos la intención legislativa, sino que, en la práctica, este Tribunal —en su función ad-judicativa— está enmendando las Reglas de Procedimiento Civil sin cumplir con el requisito constitucional de enviar-las a la Asamblea Legislativa, según lo dispuesto en la See. 6 del Art. V de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, pág. 414.
Asimismo, cabe destacar que la doctrina de enriqueci-miento injusto existe para proteger a quien sufre un empo-brecimiento, pues es esa la única manera de argumentar la doctrina ante el foro judicial. Entonces, si lo que se pre-tende por esta decisión es proteger al deudor que sufre un empobrecimiento mayor a la condonación relativa de su deuda por sentencia, ello no se evita en la mayoría de los casos, pues cuando la propiedad se adjudica a un tercero que la adquiere en la subasta a un precio menor al valor neto, a ese tercero le es impertinente el valor adeudado de la sentencia que dio lugar a la subasta. La decisión del Tribunal indica que aplica únicamente cuando es el acree-dor por sentencia quien se lleva la subasta que se declara vacante. En otras palabras, en la mayoría de los casos no se lograría evitar lo que busca alcanzar esta decisión. Peor aún, se crea un precepto distinto según el postor a favor de quien se adjudique la subasta, sin establecer una justifica-ción para ese trato desigual.
Resulta preocupante la falta de claridad sobre la aplica-ción de la nueva norma pautada por este Tribunal. La se-guridad jurídica del país y el tráfico comercial dependen necesariamente de un ámbito de certeza legal sobre la *530 forma de ejecutar sentencias y el poder coercitivo del Es-tado para compeler al pago de deudas. Nuestro andamiaje depende de una aplicación consistente de las normas que regulan los procesos de subasta. Nos preocupa particular-mente la receptividad de esta norma por parte de licitado-res de subastas futuras que, ante la aplicación incierta de la doctrina de enriquecimiento injusto, desistan de la opor-tunidad de participar en ventas judiciales ante el temor de que puedan ser objeto de reclamaciones por enriquecimien-tos relativos frente a deudores por sentencia. Nuestra labor como intérpretes de la ley debe ser evitar ese tipo de incertidumbre y abonar a la seguridad jurídica.
Por último, cabe destacar que la aplicación futura de este precedente constituirá un reto práctico incalculable para los funcionarios del tribunal que dirigen el proceso de subasta. Ahora, esos funcionarios tendrán que convertirse en expertos tasadores de todo tipo de bienes en el comercio para establecer el valor neto, como requisito para evitar el enriquecimiento injusto en las subastas. No olvidemos que, salvo contadas excepciones, el foro judicial deja en manos del alguacil del Tribunal y del acreedor ejecutante, el pro-ceso post sentencia de ejecución, venta y adjudicación de bienes para satisfacer un crédito. Atanacia Corp. v. Saldaña, Inc., 133 D.P.R. 284 (1993).
Si no puede acordarse un valor neto dentro del proceso de la subasta, las salas de instancia recibirán mociones adicionales y tendrán que convertirse en expertos tasado-res para poder resolver las disputas. A ñn de cuentas, cada bien a adjudicarse en una subasta podría terminar ante un juez quien estará obligado a determinar el valor en el mer-cado antes de que el mismo mercado lo determine en el acto de la subasta. Por consiguiente, se abre la puerta a apelaciones de todo tipo sobre el valor de los bienes y le corresponderá a los foros apelativos convertirse en tasado-res de todo tipo de bienes para saber si los foros recurridos *531 llegaron al valor neto correcto. No es esa la función que nos corresponde en situaciones como la de autos.
V
Somos conscientes de que la Opinión mayoritaria res-ponde a unos hechos muy particulares. En este caso, un profesional perdió su hogar ante una reclamación de impe-ricia que fue traída por quien luego realizó una ganancia sobre la venta de ese hogar. No hay duda de que esos he-chos nos consternan a todos. No obstante, no debemos per-der de vista que hoy ese no sería el resultado de una recla-mación por daños. Tras la aprobación de la Ley de Protección del Hogar, Ley Núm. 195 de 13 de septiembre de 2011, “[t]odo individuo ... tendrá derecho a poseer y dis-frutar, en concepto de hogar seguro ... una residencia [que] estuviere ocupad [a] por éste o por su familia exclusiva-mente como residencia principal”. Art. 3 de la Ley de Protección del Hogar, 31 L.P.R.A. sec. 1858. Conforme al refe-rido estatuto, las residencias de quienes cumplan con los requisitos de esta ley estarán protegidas contra el riesgo de embargo, sentencia y ejecución. Véase Art. 5 (31 L.P.R.A. sec. 1858b).
A pesar de lo anterior, el precedente que hoy se esta-blece afectará la ejecución de sentencias de todo tipo, inde-pendientemente del estado de derecho que protege los ho-gares de los demandados.
Por todo lo anterior, disentimos de la opinión que hoy se emite y denegaríamos el recurso de certiorari.

 En este caso la subasta se celebró según las Reglas de Procedimiento Civil de 1979. La regla vigente —Regla 51.7 (32 L.P.R.A. Ap. V) — , en lo pertinente, es igual a la derogada.